UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| MISTY B.[1], | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. 2:21-cv-0082-DLP-JPH |
| | ) |
| KILOLO KIJAKAZI, | ) |
| | ) |
| Defendant. | ) |

## ORDER

Plaintiff Misty B. requests judicial review of the denial by the Commissioner of the Social Security Administration ("Commissioner") of her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 423(d), 1383(c)(3).  For the reasons set forth below, the Court hereby **REVERSES** the ALJ's decision denying the Plaintiff benefits and **REMANDS** this matter for further proceedings.

I.   **PROCEDURAL HISTORY**

On December 27, 2018, Misty protectively filed an application for SSI, alleging disability beginning November 1, 2015.  (Dkt. 20-2 at 17, R. 16).  Misty's application alleged disability resulting from a brain lesion, asthma, anemia, B12 deficiency, blood pressure, fibromyalgia, arthritis, anxiety disorder, depression,

---

[1] In an effort to protect the privacy interests of claimants for Social Security benefits, the Southern District of Indiana has adopted the recommendations put forth by the Court Administration and Case Management Committee of the Administrative Office of the United States Courts regarding the practice of using only the first name and last initial of any non-government parties in Social Security opinions. The Undersigned has elected to implement that practice in this Order.

irritable bowel syndrome, psoriasis, chronic vascular insufficiency of the intestine, chronic pancreatitis, migraines, and allergies. (Dkt. 20-6 at 3, R. 259). The Social Security Administration ("SSA") denied Misty's claim initially on May 24, 2019, (Dkt. 20-3 at 23-36, R. 162-75; Dkt. 20-4 at 2-5, R. 195-98), and on reconsideration on August 5, 2019. (Dkt. 20-3 at 37-55, R. 176-94; Dkt. 20-4 at 7-9, R. 200-02). Misty made a written request for a hearing, (Dkt. 20-4 at 10, R. 203), which was granted.

On September 2, 2020, a hearing was held before Administrative Law Judge ("ALJ") James J. Kent, where Misty, her counsel, and vocational expert Amelia Shelton all appeared telephonically. (Dkt. 20-2 at 37-59, R. 36-58). On September 17, 2020, ALJ Kent issued an unfavorable decision finding that Misty was not disabled. (Dkt. 20-2 at 17-29, R. 16-28). On December 2, 2020, the Appeals Council denied Misty's request for review, making the ALJ's decision final. (Dkt. 20-2 at 2-5, R. 1-4). Misty now seeks judicial review of the ALJ's decision denying benefits. *See* 42 U.S.C. § 1383(c)(3).

## II.  STANDARD OF REVIEW

To qualify for disability, a claimant must be disabled within the meaning of the Social Security Act. To prove disability, a claimant must show she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). To meet this definition, a claimant's impairments must be of such severity that she is not able to perform the work she

previously engaged in and, based on her age, education, and work experience, she cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy.  42 U.S.C. § 1382c(a)(3)(B).

The SSA has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a).[2] The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves [her] unable to perform [her] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted).  An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled.  20 C.F.R. §§ 404.1520; 416.920; *Briscoe*, 425 F.3d at 352.  If a claimant satisfies steps one and two, but not three, then she must satisfy step four.  Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy.  *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995); *see also* 20 C.F.R. §§ 416.920; 404.1520 (A negative answer at any point, other than

---

[2] The Code of Federal Regulations contains separate, parallel sections pertaining to disability benefits under the different titles of the Social Security Act, such as the one cited here that is applicable to supplemental security income benefits. Often, as is the case here, the parallel section pertaining to the other type of benefits—in this case disability insurance benefits—is verbatim and makes no substantive legal distinction based on the benefit type. *See* 20 C.F.R. § 404.1520(a).

3

steps three and five, terminates the inquiry and leads to a determination that the claimant is not disabled.).

After step three, but before step four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The RFC is an assessment of what a claimant can do despite her limitations. *Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004). In making this assessment, the ALJ must consider all the relevant evidence in the record. *Id.* at 1001. The ALJ uses the RFC at step four to determine whether the claimant can perform her own past relevant work and, if not, at step five to determine whether the claimant can perform other work in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv)-(v); 416.920(a)(4)(iv)-(v).

The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id.* The Commissioner must then establish that the claimant—in light of her age, education, job experience, and residual functional capacity to work—is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(f); 416.920(f).

Judicial review of the Commissioner's denial of benefits is to determine whether it was supported by substantial evidence or is the result of an error of law. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). This review is limited to determining whether the ALJ's decision adequately discusses the issues and is

based on substantial evidence. Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether Misty is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

Under this administrative law substantial evidence standard, the Court reviews the ALJ's decision to determine if there is a logical and accurate bridge between the evidence and the conclusion. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). In this substantial evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000), *as amended* (Dec. 13, 2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, he must build an "accurate and logical bridge from the evidence to his conclusion," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for the decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in his decision, but he cannot ignore a line of evidence that undermines the conclusions he made, and he must trace the path of his reasoning and connect the evidence to his findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford,* 227 F.3d at 872.

### III. BACKGROUND

#### A. Factual Background

Misty was thirty-nine years old on the date her application was filed. (Dkt. 20-2 at 27, R. 26). She completed the eleventh grade. (Dkt. 20-2 at 42, R. 41). She has past relevant work as a fast-food worker. (Dkt. 20-2 at 27, R. 26).

#### B. ALJ Decision

In determining whether Misty qualified for benefits under the Act, the ALJ employed the five-step sequential evaluation process set forth in 20 C.F.R. § 416.920(a) and concluded that Misty was not disabled. (Dkt. 20-2 at 17-29, R. 16-28). At Step One, the ALJ found that Misty had not engaged in substantial gainful activity since her application date of December 27, 2018.[3] (Id. at 19, R. 18).

---

[3] SSI is not compensable before the application date. 20 C.F.R. § 416.335.

At Step Two, the ALJ found that Misty had the following severe impairments: carpal tunnel syndrome, status post July 2019 carpal tunnel release surgery of the bilateral hands; fibromyalgia; depressive disorders; and anxiety disorder. (Dkt. 20-2 at 19, R. 18). The ALJ found that Misty's asthma, generalized abdominal pain, and obesity were not severe. (Id. at 20, R. 19).

At Step Three, the ALJ found that Misty's impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, considering Listings 11.00 (neurological disorders), 12.04 (depressive, bipolar and related disorders), and 12.06 (anxiety and obsessive-compulsive disorders). (Dkt. 20-2 at 21-23, R. 20-22). When considering the "paragraph B" criteria, the ALJ found that Misty had moderate limitations in understanding, remembering, or applying information; interacting with others; and concentrating, persisting, or maintaining pace; and mild limitations in adapting or managing oneself. (Id. at 21-22, R. 20-21). The ALJ also found the "paragraph C" criteria not satisfied. (Id. at 23, R. 22).

After Step Three but before Step Four, the ALJ found that Misty had the residual functional capacity ("RFC") to perform "light work," as defined in 20 C.F.R. § 416.967(b), "except that the claimant can frequently push, pull, handle, and finger with the bilateral upper extremities. The claimant can perform simple, routine, and repetitive tasks; occasional contact with coworkers, supervisors, and the public; few, if any changes in the work setting; no production rate paced work." (Dkt. 20-2 at 23-27, R. 22-26).

At Step Four, the ALJ concluded that Misty had past relevant work as a fast-food worker and that she was unable to perform that work. (Dkt. 20-2 at 27, R. 26). At Step Five, relying on the testimony of the vocational expert, the ALJ concluded that there were jobs that existed in significant numbers in the national economy that Misty could perform, such as mail clerk, marker, and routing clerk. (Id. at 27-28, R. 26-27). The ALJ thus concluded that Misty was not disabled. (Id. at 28, R. 27).

## IV. ANALYSIS

Misty challenges the ALJ's decision on two bases. First, Misty contends that the ALJ erred by impermissibly interpreting new and significant medical evidence without subjecting the medical records to expert review. (Dkt. 29 at 14-19). Second, Misty argues that the ALJ's residual functional capacity assessment is flawed because it fails to account for her moderate limitations in mental functioning. (Id. at 19-23). The Court will address each of Misty's arguments, in turn, below.

### A. Failure to Use a Medical Expert

The hearing in this case was held on September 2, 2020. (Dkt. 20-2 at 37, R. 36). The state agency physicians who reviewed Misty's records and rendered an opinion regarding her RFC did so on May 23, 2019, (Dkt. 20-3 at 23-35, R. 162-74) (initial determination by Dr. J. Sands) and on August 2, 2019, (Dkt. 20-3 at 37-54, R. 176-93) (reconsideration determination by Dr. M. Ruiz). Both Dr. Sands and Dr.

Ruiz opined, based on the records that they reviewed, that Misty could "perform work at the light exertional level with limited pushing and pulling, and frequent handling and fingering, with the bilateral upper extremities due to the carpal tunnel syndrome. She had no postural limitations and no environmental limitations." (Dkt. 20-2 at 26, R. 25) (ALJ's summary of state agency physicians' opinions). The ALJ found these opinions to be

> most persuasive, as [they are] consistent with the medical evidence and the record overall. Multiple treatment records indicated essentially normal physical examinations, along with the findings from the physical consultative evaluation report. The claimant had no significant complications or issues preventing her from work related activities.

*(*Id.). Thus, the ALJ adopted the physical limitations found by Dr. Sands and Dr. Ruiz in his RFC determination. (*See* Dkt. 20-2 at 23, 26, R. 22, 25).

Misty argues that it was error for the ALJ to rely on the opinions of the state agency physicians because

> there are many new treatment records since August 2019 that suggest worsening and new conditions, records that the state agency consultants could not have reviewed and which have not been interpreted by any medical expert to determine whether they better support Plaintiff's alleged disabling severity of her limitations.

(Dkt. 29 at 14-15).

"An ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018), *as amended on reh'g* (Apr. 13, 2018). This is because "ALJs are required to

rely on expert opinions instead of determining the significance of particular medical findings themselves." *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (quoting *Moon v. Colvin,* 763 F.3d 718, 722 (7th Cir. 2014)). As the Seventh Circuit explained recently:

> This court has stated repeatedly that an ALJ may not "play[ ] doctor and interpret new and potentially decisive medical evidence without medical scrutiny." *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) (internal quotation marks omitted); *see also Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018)*; Akin v. Berryhill*, 887 F.3d 314, 317-18 (7th Cir. 2018); *Moreno v Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018). Now not all new evidence will necessitate a remand. As the agency notes, in two unpublished cases, *Keys v. Berryhill*, 679 F. App'x 477 (7th Cir. 2017), and *Olsen v. Colvin,* 551 F. App'x 868 (7th Cir. 2014), this court upheld the denial of benefits when MRI evidence post-dating the state agency consultant's report showed only mild changes in the claimants' respective conditions. The issue, then, comes down to whether the new information "changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment by a non-examining physician and by evaluating himself the significance of [the subsequent] report," *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016), or whether the updated information was minor enough that the ALJ did not need to seek a second opinion.

*Kemplen v. Saul*, 844 F. App'x 883, 887 (7th Cir. 2021), *as amended on reh'g in part* (June 21, 2021).

Here, Misty points to the following medical records that were not available to the state agency physicians:

- an August 27, 2019, CT scan showing a hernia in Misty's right paracentral ventral pelvic wall, (Dkt. 20-15 at 41, R. 2518);
- a December 2, 2019, endoscopy that showed mild gastritis and possible gastroparesis, (Dkt. 20-15 at 136, R. 2613);

- a June 3, 2020, EMG, (Dkt. 20-15 at 242, R. 2719), after which Misty's primary care physician referred her for a neurosurgical consultation, (Dkt. 20-15 at 239, R. 2716);

- clinical exam findings noted by her hand surgeon on September 12, 2019, at which Misty continued to complain of pain after her July 1, 2019, carpal tunnel release surgery, in which the surgeon noted "good wrist and finger range of motion bilaterally," "mild swelling along the proximal palms bilaterally with mild tenderness to palpitation," "mild dullness about the right thumb, index middle finger with dullness about the left thumb and mild dullness along the left index middle finger," and gave Misty a steroid injection in her right carpal tunnel, (Dkt. 20-13 at 338, R. 2160);[4]

- clinical exam findings by a treating pain management nurse practitioner on September 9, 2019, that found "facet mediated pain upon physician exam"; the nurse practitioner also stated that she thought there was a "large psychological component contributing to the pain," (Dkt. 20-15 at 198-99, R. 2675-76);

- October 15, 2019, x-rays of the lumbar spine that found "[s]light retrolisthesis of L2 on L3 and more prominently of L3 on L4 on the flexion and extension view[] [that] may be artifactual related to patient rotation," (Dkt. 20-15 at 69, R. 2546);

---

[4] An exam on August 8, 2019, had noted dullness only along the left thumb, with otherwise normal sensation. (Dkt. 20-13 at 368, R. 2190).

11

- September 18, 2019, pulmonary function testing that found "airways obstruction which is incompletely reversible associated with air trapping, all of which is consistent with chronic obstructive pulmonary disease that is surprisingly severe for this patient's relatively young age and relatively low 31 pack-year smoking history," (Dkt. 20-15 at 65, R. 2542);
- notes from a September 30, 2019, emergency room visit which noted oxygen saturation at 95% on room air and mild expiratory wheezing, (Dkt. 20-15 at 7-8, R. 2484-85); and
- July 8, 2020, notes from treating pulmonologist Dr. Bhuptani noting diminished breath sounds and occasional wheezing; nebulizer treatments were prescribed, (Dkt. 20-15 at 293, R. 2770).

Misty argues that these are new and significant medical findings, and therefore it was error for the ALJ to evaluate them himself, without the aid of a medical expert. (Dkt. 29 at 15-18). The Commissioner asserts that all of these conditions including Misty's "hernia, back pain, carpal tunnel syndrome, breathing condition, and gastrointestinal upset…were considered by state agency physicians Drs. Sands and Ruiz, in May and August 2019…. The diagnoses were not new." (Dkt. 30 at 8). Yet, the Court has been unable to identify any records where the state agency doctors mentioned a hernia, and the Commissioner does not point to any evidence of record that was before them in which Misty was diagnosed with one. Rather, the Court's review of the record indicates that an April 20, 2019, examination during an emergency room visit for back pain revealed no hernia, (Dkt.

20-11 at 80, R. 1423), while a June 30, 2020, exam noted a "palpable and large hernia to right lower abdomen," (Dkt. 20-15 at 265, R. 2742). In between, an August 27, 2019, CT scan revealed an "[i]ncreased/new 7 cm x 8.9 cm right paracentral ventral pelvic wall, fat only hernia," (Dkt. 20-15 at 39, R. 2516), and a February 19, 2020, CT scan revealed that the hernia had increased in size to "up to 10.5 cm in craniocaudal dimension, 3.9 cm AP and approximately 10 cm transverse." (Dkt. 20-14 at 233, R. 2443). Given that Drs. Sands and Ruiz rendered their opinions in May 2019 and August 2019, respectively, they did not consider Misty's hernia when they determined that she could perform light work. Of course, the Court, not being a medical expert, has no way of knowing whether the hernia diagnosis would have altered the state agency physicians' opinions. The salient point is that ALJ, who is similarly lacking in medical expertise, also does not know, and therefore "must not succumb to the temptation to play doctor." *Deborah M. v. Saul*, 994 F.3d 785, 790 (7th Cir. 2021).

The lack of an expert medical opinion regarding Misty's hernia on her ability to work is especially troubling given the fact that the ALJ did not acknowledge the hernia diagnosis when he determined that "generalized abdominal pain" was not a severe impairment. (Dkt. 20-2 at 20, R. 19). Indeed, the ALJ stated that Misty

> normally had normal physical examinations, including abdominal exams (Exhibits B6F; B8F; B12F-B14F; B27F; B33F). The July 2019, August 2019, October 2019, and November 2019, radiology of the abdomen and pelvis all showed no acute findings, no evidence of an acute intra-abdominal process (Exhibit B31F/40, 56, 93, and 95).

13

(Dkt. 20-2 at 20, R. 19). At least one of the exhibits cited by the ALJ here, noted the hernia, (*see* Dkt. 20-15 at 163, R. 2640), and the ALJ failed to acknowledge it. The later record describes Misty's hernia as "palpable and large" upon examination. (Dkt. 20-15 at 265, R. 2742). The ALJ's implicit determination that the findings in the medical reports he cites to support a finding that Misty was not experiencing severe abdominal pain and other severe abdominal symptoms is an example of an ALJ impermissibly "'play[ing] doctor' and reach[ing] his own independent medical conclusions." *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009).

Similarly, the fact that the state agency physicians did not have Misty's September 18, 2019, pulmonary function test results, as well as other medical records relating to her breathing issues, is troubling. The Commissioner argues that these test results were invalid[5] because it was noted that Misty made "poor effort" by the technician who performed the test. (Dkt. 30 at 8.). The Commissioner points to no physician's opinion, however, that finds the test results were invalid.

---

[5] To support this argument, the Commissioner cites to 20 C.F.R. § 404, subpt. P, app. 1, § 3.00(E)(3)(b), which provides:
    3. The spirometry report must include the following information:
    a. The date of the test and your name, age or date of birth, gender, and height without shoes. (We will assume that your recorded height on the date of the test is without shoes, unless we have evidence to the contrary.) If your spine is abnormally curved (for example, you have kyphoscoliosis), we will substitute the longest distance between your outstretched fingertips with your arms abducted 90 degrees in place of your height when this measurement is greater than your standing height without shoes.
    b. Any factors, if applicable, that can affect the interpretation of the test results (for example, your cooperation or effort in doing the test).
Recognizing this regulation provides that a person's effort can affect the interpretation of one's test results, the Court disagrees with the Commissioner's position that it also supports the notion that "poor effort essentially renders the results meaningless for disability purposes." (Dkt. 30 at 9).

14

Instead, as the Commissioner points out, one pulmonologist found that the test results were "consistent with chronic obstructive pulmonary disease," (Dkt. 20-15 at 65, R. 2542), while another interpreted the test as supporting a diagnosis of asthma, not obstructive disease. (Dkt. 20-15 at 186, R. 2663).

The Commissioner also argues that

> Plaintiff's tests and imaging did not go unexamined. They were interpreted by her own medical providers. For example, Plaintiff argues that the ALJ interpreted Plaintiff's 2020 EMG by himself. Pl. Br. 15. To the contrary, the ALJ relied upon and drew his language directly from the interpretation of the EMG that was provided by Plaintiff's own providers. Dkt. 20-2 at p. 24, R. 23 (citing Dkt. 20-15 at p. 243, R. 2720).

(Dkt. 30 at 9.) The language in the ALJ's decision referenced by the Commissioner reads as follows:

> Then in June 2020, radiology the claimant had mild bilateral carpal tunnel syndrome, left worse than the right, left C5 nerve root lesion, and right C5 nerve root lesion involving posterior primarily. Compared to the previous study in February 2019, there was improvement in the axonal degeneration noted previously in right median innervated intrinsic hand muscles, which was no longer evident. She had new development of cervical nerve root lesion which was not present previously, slight worsening of the median nerve conduction across the left carpal tunnel (Exhibit B36F/16).

(Dkt. 20-2 at p. 24, R. 23). The Commissioner is correct that this language does appear in the EMG report; however, the ability to cite to these records is not the same as the ability to understand the relevance of these findings to the claimant's symptoms and ability to function. For example, the question remains whether the presence of a "left C5 nerve root lesion," a new finding that the state agency physicians were not aware of, affects Misty's ability to frequently push, pull, handle,

15

and finger. State agency reviewer Dr. Sands specifically noted that there was "no evidence of c nerve root lesion" in Misty's February 2019 EMG, (Dkt. 20-3 at 29, R. 168), suggesting that the presence of such a finding may have been relevant to his analysis.  The Commissioner's argument ignores the fact that the ALJ implicitly determined that this new evidence did not affect Misty's abilities, but the ALJ was not qualified to make that determination on his own.  *See McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) (ALJ was not qualified to assess on his own how MRI results related to other evidence in the record).

Finally, the Commissioner's suggestion that the fact that Misty's counsel did not ask the ALJ to obtain additional medical opinions precludes a finding of error ignores the fact that "[i]t is an ALJ's responsibility to recognize the need for further medical evaluations of a claimant's conditions before making RFC and disability determinations." *Chase v. Astrue*, 458 F. App'x 553, 557 (7th Cir. 2012) (citing *Scott v. Astrue,* 647 F.3d 734, 741 (7th Cir. 2011); *Barnett v. Barnhart,* 381 F.3d 664, 669 (7th Cir. 2004); *Golembiewski v. Barnhart,* 322 F.3d 912, 918 (7th Cir. 2003); *Smith v. Apfel,* 231 F.3d 433, 437 (7th Cir. 2000)).  Nor is the Commissioner's citation to various notations that Misty gave poor effort on tests helpful. (*See* Dkt. 30 at 10-11). First, the ALJ did not acknowledge many of the notations cited by the Commissioner, and "[t]he Court's review is limited to the reasons articulated in the ALJ's decision." *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (attempts to bolster ALJ's position with post-hoc rationale are impermissible); *Phillips v. Astrue,* 413 F. App'x 878, 883 (7th Cir. 2010) ("We confine our review to the reasons

offered by the ALJ and will not consider post-hoc rationalizations that the Commissioner provides to supplement the ALJ's assessment of the evidence."); *Villano v. Astrue*, No. 2:07-cv-187, 2009 WL 1803131, at *3 (N.D. Ind. June 23, 2009) (Commissioner's position limited to the ALJ's written decision, especially with respect to the required bridge between facts and conclusions, thus prohibiting post-hoc rationalization). Here, the ALJ noted that Dr. Titzer, who conducted a consultative examination in May 2019, noted that Misty gave "less than 100% effort" and that the "challenging movements indicate[d] that she did have stronger grip than she presented." (Dkt. 20-2 at 25, R. 24). This information, however, was provided to the state agency reviewers. (Dkt. 20-3 at 25, 41, R. 164, 180). In addition, the ALJ noted Misty's poor effort on the pulmonary function test. (Id. at 20, R. 19). The fact that the ALJ relied on two instances of poor effort in his decision does not change the fact that he also interpreted the significance of other new evidence they may have rendered Misty disabled. The ALJ relied on the state agency physicians' opinions in arriving at his RFC determination, finding those opinions "most persuasive," but those opinions were based on incomplete information. Remand is required to correct this error.

### B. Failure to Accommodate Psychological Limitations in the RFC

In assessing the "B Criteria," the ALJ found that Misty had moderate limitations in understanding, remembering, or applying information; interacting with others; and concentrating, persisting, or maintaining pace; as well as a mild limitation in adapting or managing herself. (Dkt. 20-2 at 21, R. 20). In arriving at

17

his RFC, the ALJ stated that Misty "has mental restrictions to accommodate her symptoms of limited concentration and interacting with others." (Dkt. 20-2 at 26, R. 25). The relevant restrictions contained in the RFC are as follow: "can perform simple, routine, and repetitive tasks; occasional contact with coworkers, supervisors, and the public; few, if any changes in the work setting; no production rate paced work." (Dkt. 20-2 at 23, R. 22). In reviewing the ALJ's decision, however, the Court finds it completely devoid of any explanation regarding why he believes these restrictions sufficiently address the moderate and mild mental limitations he found. *See Dawn F. v. Saul*, No. 1:20-cv-01374-RLY-DLP, 2021 WL 4445002, at *17 (S.D. Ind. Sept. 8, 2021), *report and recommendation adopted*, 2021 WL 4441529 (S.D. Ind. Sept. 28, 2021) ("The Seventh Circuit has established that when an ALJ determines that a claimant has moderate limitations in concentration, persistence, or pace, and then assigns work that is simple and routine, the ALJ's decision must contain some rationale to explain how the simple work restriction accommodates the claimant's particular limitations." (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010); *DeChamp v. Berryhill*, 916 F.3d 671, 676 (7th Cir. 2019); *Martin v. Saul*, 950 F. 3d 369, 374 (7th Cir. 2020)).

  The Commissioner argues that this cannot be error because the mental limitations found by the ALJ were greater than those found by any doctor; indeed, the only psychological opinions in the record were from the state agency psychologists, who found that Misty had no severe mental impairments. (*See* Dkt. 30 at 11) ("When no doctor's opinion indicates greater limitations than those found

by the ALJ, there is no error." *Dudley v. Berryhill*, 773 F. App'x 838, 843 (7th Cir. 2019); *see also Best v. Berryhill*, 730 F. App'x 380, 382 (7th Cir. 2018) ("There is no error when there is no doctor's opinion contained in the record that indicated greater limitations than those found by the ALJ.") (internal quotation marks and citation omitted)). The Commissioner's argument that Misty's RFC argument fails because she has not identified greater limitations than those adopted by the ALJ is compelling. The difficulty, however, is the lack of an explanation. Because the ALJ found that Misty had various psychological limitations, he was required to explain how the restrictions in his RFC accommodated those limitations. *See Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).

Here, the ALJ did not explain how Misty's particular issues with understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself were accommodated by his RFC. Without such an explanation, the Court is unable to trace the ALJ's reasoning. On remand, the ALJ will have the opportunity, if appropriate, to further explain how the evidence of record supports the RFC.

### V. CONCLUSION

For the reasons detailed herein, the Court **REVERSES** the ALJ's decision denying the Plaintiff benefits and **REMANDS** this matter for further proceedings. Final judgment will issue accordingly.

So ORDERED.
Date: 9/9/2022

*/s/ Doris L. Pryor*
Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana

19

Distribution:

All ECF-registered counsel of record via email.